Cortés Trigo, Juez Ponente
*725 TEXTO COMPLETO DE LA SENTENCIA
En el presente recurso de apelación se solicita la revisión de las sentencias dictadas por el Tribunal de Primera Instancia, Sala Superior de San Juan, Hon. Kalil Bacó Viera (TPI), el 22 de diciembre de 2005, notificadas el mismo día. Dicho foro condenó al Dr. José Acevedo Martínez (Dr. Acevedo) a cumplir condena de seis años de cárcel por cometer el delito de falsificación de documentos tipificado en el Artículo 271 del anterior Código Penal (Art. 271 del Código Penal), 33 L.P.R.A. see. 4591, consecutiva con seis (6) meses por el delito de certificaciones falsas expedidas por funcionarios públicos tipificado en el Artículo 207 del anterior Código Penal (Art. 207 del Código Penal), 33 L.P.R.A. see. 4358, y un año por el delito tipificado en el Artículo 3.2 (c) de la Ley de Ética Gubernamental (Art. 3.2 (c) de la Ley de Ética), 3 L.P.R.A. see. 1822 (c).
Al instarse la presente apelación, el apelante se encontraba confinado en una institución federal cumpliendo las sentencias impuestas en el presente caso concurrentemente con la sentencia impuesta por el Tribunal Federal para el Distrito de Puerto Rico en el caso número 04-277(PG).
I
Al Dr. Acevedo se le imputó que el 15 de diciembre de 2000, mientras se desempeñaba como Administrador de la Administración de Servicios de Salud Mental y Contra la Adicción (ASSMCA), a sabiendas, ilegal, maliciosa, intencional y criminalmente, Hizo un escrito falso mediante el cual se creó un derecho.
El juicio se celebró por jurado el 30 de noviembre y los días 1, 7, 8, y 9 de diciembre de 2005. La prueba de cargo consistió de los testimonios de 22 testigos: Sr. Rafael García Álvarez, Sra. Marylin de Jesús Cruz, Sra. Nydia Maritza Navarro Rodríguez, Sr. Héctor Méndez Alvarado, Sra. María del Carmen Martínez Resto, Sra. Elsa I. González Nieves, Sra. Lydia Julia Betancourt Montañez, Sr. Alberto Santana Rosa, Sra. Hilda O'Neill Borrero, Sr. Iván O'Neill León, Sra. Virgen Meléndez Díaz, Sra. Myrna Maldonado Negrón, Sra. Lourdes M. Morales Cales, Sra. Hedga J. García Cruz, Leda. Ivette Molina Rivera, Dra. Awilda Montalvo Montalvo, Lie. Marisol Marchand Castro, Sr. Benjamín Pérez Martínez, Sr. Luis Ángel Crespo Nieves, Sr. Juan A. Flores Galarza, Sra. Felicita Díaz Sambolín y Dra. Carmen Feliciano de Melecio (lectura de su declaración jurada).
Por la defensa testificaron el Dr. Ramón Alonso Santiago, la Sra. Carmen Gloria Despiau Bravo y la Sra. Carmen I. Haddock Cardona. Declararon, como prueba de refutación, el Sr. Alexis Morales Fresse y la Sra. Felicita Cintrón Rodríguez. Además, las partes presentaron prueba documental.
Para una mejor comprensión del recurso a continuación, resumimos la prueba testifical según ésta surge de la transcripción estipulada de la prueba oral (TE).
*726 A. RESUMEN DE LA PRUEBA PRESENTADA POR EL MINISTERIO PUBLICO
1. Rafael García Álvarez (TE, 30 de noviembre de 2005, págs. 11-31)
Administró el Hospital de Psiquiatría Ramón Fernández Marina (Hospital de Psiquiatría) del 2003 al 2004. Como Administrador de Servicios de Salud de Hospitales en el Departamento de Salud hizo una investigación en los archivos, a petición de los Doctores Aida Gregory y Johnny Rullán, para auscultar si había algún documento, comunicación o contrato entre el Dr. Pedro J. Rosselló González (Dr. Rosselló) y el Hospital de Psiquiatría para unos años específicos. No encontró documento alguno de los años 60, ni comunicaciones que se refirieran a contratos por servicios profesionales para esas fechas de dicha persona y así lo hizo constar mediante comunicación de 29 de abril de 2004.al Dr. Rullán. (TE págs.12-19).
En el contrainterrogatorio indicó que recibió una carta del Dr. Rosselló fechada 20 de abril de 2004 informándole que él había trabajado mediante contratos en el Hospital de Psiquiatría para los años de 1962 al 1966 durante los períodos de verano y solicitaba copia de todos los documentos de servicios prestados durante esa época. (TE pág. 21). Los récords de contratos de 1960 estaban archivados en un cuarto clausurado en. archivos de cartón y no estaban bien organizados. (TE pág. 24). Limitó su búsqueda a los documentos que estaban en el Hospital de Psiquiatría. (TE pág. 28).
2. Marilyn de Jesús Cruz (TE, 30 de noviembre de 2005, págs. 36-48)
Trabajaba en la División de Servicios al Empleado en la Oficina de Recursos Humanos del Departamento de Salud. Era la empleada que tramitaba y coordinaba las gestiones con el Sistema de Retiro, siendo la coordinadora de todos los asuntos sobre el retiro de empleados públicos. (TE págs. 37-38).
Hasta el 1984, el Departamento de Salud administraba el Hospital de Psiquiatría. Un empleado que hubiera trabajado para el Departamento de Salud en el 1962 o para la época de los 60 que quisiera acogerse al retiro y trabajase al presente para otra agencia, podía solicitar a la Oficina que ella dirigía la hoja de servicio y obligatoriamente tenía que llevar esa hoja de servicio al Sistema de Retiro. Si trabajaba en otra agencia, fuera La Fortaleza, la Gobernación u otra, tenía que solicitar los años de servicio para todas las agencias donde trabajó hasta la última y hasta que sumaran los treinta años. Si eran empleados por contrato, le solicitaban la certificación a la División de Contratos y con esa certificación le enviaban a la agencia que la solicitaba o se entregaban al empleado. (TE págs. 40-43).
En su oficina no se recibió solicitud alguna del Dr. Rosselló para acogerse al Retiro. No vio documento alguno con el nombre del Dr. Rosselló para una certificación. El caso del Dr. Rosselló podría haber pasado por su oficina, pero también por la de Contratos. Los contratos no cotizan. Si el empleado quería cotizar tenía que pagar el tiempo que trabajó y solicitar una certificación a la División de Contratos. Pudiera ser que ella atendiera estos casos. En el caso del Dr. Rosselló, no tramitó nada, ni supo nada con relación a este caso. (TE págs. 45-48).
En el contrainterrogatorio indicó que si la persona no trabajó en el Departamento de Salud no tenía entonces que solicitar certificación alguna a su oficina. (TE pág. 49).
3. Nydia Maritza Navarro Rodríguez (TE, 30 de noviembre de 2005, págs. 49-67)
Desde el 1998 ha ocupado el puesto de Directora de la Oficina de Contratos en el Departamento de Salud. Revisa y tramita todos los contratos de Servicios Profesionales y Consultivos que generan las distintas facilidades adscritas a la agencia. Su oficina prepara certificaciones bajo su firma indicando los servicios por contratos prestados, incluyendo el sueldo y otros detalles. Las personas que laboraron por contrato y quieren *727 que esos contratos fueran cotizados, solicitan una Certificación de Empleo. (TE págs. 50-52).
Ella tuvo que buscar los registros para las personas que trabajaron en el 1962 y ahí encontró que las personas que trabajaban para el Hospital de Psiquiatría tenían los contratos registrados en los archivos y en los registros que estaban bajo su custodia en su oficina. Su oficina era la custodia de todos los expedientes originales. Era custodia de todos los registros y de la bitácora que se llevaba por año fiscal, incluyendo las enmiendas y todo lo relacionado a los trabajos por contrato. Hizo una búsqueda en sus registros para los años 1962, 1963 y 1964 sobre el Dr. Rosselló para ver si aparecía registrado en la bitácora de esos años. No aparecía contrato alguno registrado a su nombre en el Departamento de Salud y preparó una certificación a esos efectos. Verificó los expedientes inactivos y no encontró nada para los años que estaban preguntando. En la bitácora no aparecía nada para esos años en específico. Para otros años aparecieron unos contratos, lo cual certificó. (TE págs. 52-55).
Identificó las certificaciones que preparó con los Exhibits 2, 3, y 4 del Pueblo. En la certificación de 8 de febrero de 2005 (Exhibit 3) hizo constar que para los años fiscales 1964 a 1965 no aparecía registrado contrato alguno con el Dr. Rosselló. En la certificación de 14 de abril de 2004 (Exhibit 4) certificó que encontró un expediente del Dr. Rosselló que estaba en el archivo inactivo del Departamento de Salud que tenía el contrato número 77-1311 mediante el cual el Dr. Rosselló prestó servicios como Consultor para el establecimiento del Centro de Trauma, con vigencia de 1 de septiembre de 1976 al 30 de junio de 1978 con un promedio de trece horas semanales a $500.00 mensuales. Encontró otros casos para los años 1976 al 1978, 1979 al 1980. No hizo una certificación sobre trabajos alegadamente prestados para los años 1962 al 1964 por el Dr. Rosselló en el Hospital de Psiquiatría porque no encontró contratos de esos años. No tramitó gestión de retiro para éste. (TE págs. 58-60).
En el contrainterrogatorio indicó que no tenía conocimiento sobre cómo operaba el Hospital de Psiquiatría para los años 1962, 1963, 1964 y 1965, ni si la Escuela de Medicina de la Universidad de Puerto Rico operaba un centro de tratamiento dentro de las facilidades del Hospital de Psiquiatría para esos años. Añadió que si una persona trabajaba mediante contrato de la Escuela de Medicina del Recinto de la Universidad de Puerto Rico prestando servicios en el Hospital de Psiquiatría, esa persona aparecía en la nómina de la Escuela no en la del Departamento de Salud y entonces su oficina no tendría que hacer búsqueda alguna. No tiene conocimiento de si fueron a la Universidad de Puerto Rico a indagar si efectivamente el Dr. Rosselló trabajó en el Hospital de Psiquiatría durante los años 62, 63 y 64. (TE págs. 61-63).
En el recontrainterrogatorio indicó que la carta de 18 de abril de 2004 del Dr. Rosselló (Exhibit 1 de la defensa) no decía que el Dr. Rosselló hubiera trabajado para la Escuela de Medicina, sino para el Hospital de Psiquiatría del Departamento de Salud. Si era para la Escuela de Medicina, la carta debía decirlo. (TE pág. 67).
4. Héctor Méndez Alvarado (TE, 30 de noviembre de 2005, págs. 68-76)
Se desempeña como Administrador de Documentos Públicos del Departamento de Salud desde hace 13 años. Entre sus funciones se encuentra el cuido y la protección de los documentos, así como la conservación y disposición de los mismos. Estos documentos incluian los del Departamento de Salud y los de AFASS, la cual fue eliminada con la Reforma de Salud. En el almacén ha visto expedientes hasta de 1945. (TE pág. 68-72).
Para el 2004 le solicitaron que buscara el expediente del Dr. Rosselló. Fue al almacén de Bayamón y lo encontró inmediatamente. Los expedientes se encuentran en orden alfabético y hay un expediente para cada persona. Primero se buscaba en unos listados y luego en el expediente a base de un número. El expediente del Dr. Rosselló lo entregó en el área de contratos. Le filmaron y nadie más tocó el expediente. Él era el único que tenía llave del almacén y los guardias de seguridad. (TE págs. 71-75).
*728 Preparó una certificación (Exhibit 5 del Pueblo) en la cual estableció que el expediente del Dr. Rosselló tenía tres contratos: 1 de septiembre de 1976 hasta el 30 de junio de 1978; 1 de julio de 1978 hasta el 30 de junio de 1979; y 1 de agosto de 1979 hasta el 30 de septiembre de 1979. Fueron los únicos contratos encontrados. (TE págs. 75-86).
5. María del Carmen Martínez Resto (TE, 30 de noviembre de 2005, págs. 77-89)
Hace 29 años que trabaja para ASSMCA y al presente es la Administradora de Documentos. Se desempeñaba como Supervisora de Comeo y tenía una designación por la Administración de Servicios Generales de Administradora de Documentos por la cual tenía a cargo la correspondencia inactiva de la agencia. La correspondencia inactiva se guardaba en el antiguo Hospital Ruiz Soler en Bayamón y ella era la encargada y custodia de la misma. (TE págs. 78-79).
Respecto al caso del Dr. Rosselló, nadie le solicitó que hiciera una búsqueda sobre los contratos de éste para los años 60. Para ese entonces su superior era el Dr. Acevedo. (TE pág. 80).
Para el 2004, la Sra. Lourdes Morales, quien era la encargada del archivo activo del área de personal de la agencia, le solicitó que le indicara si tenía algo en el archivo relacionado al Dr. Rosselló. Ella le contestó que no, ya que conocía los documentos que había en los archivos. De todas maneras fueron juntas y buscaron a ver si había algo sobre el caso y la Certificación de 15 de diciembre de 2000 (Exhibit 7 del Pueblo) (Certificación). Buscaron en todos los listados que indicaban los documentos que había en los archivos. Había como dos gavetas de listas de documentos y no había nada relacionado al retiro del Dr. Rosselló. (TE págs. 81-85).
En el contrainterrogatorio indicó que ella no tenía nada del Hospital de Psiquiatría en sus archivos, ni de empleados regulares ni de contratos. (TE pág. 86).
6. Elsa I. González Nieves (TE, 30 de noviembre de 2005, págs. 90-97)
Trabajaba en ASSMCA desde hace 15 años. Para abril de 2004 se desempeñaba como Asistente Administrativo Confidencial. Desde el 2001, su labor era de recibir, registrar y hacer listados de toda la correspondencia. (TE pág. 91).
En el 2004 le solicitaron que hiciera una búsqueda en los archivos sobre cualquier correspondencia relacionada a la Certificación. Buscó en los archivos de los años 1999, 2000 y 2001 en los récords de Recursos Humanos, de Contratos y del Hospital de Psiquiatría, de Río Piedras, ya que le dijeron que la documentación era relacionada a la Certificación. Buscó, además, en el sexto piso del edificio de ASSMCA, Oficina del Administrador, en un cuartito donde se archivaba la correspondencia inactiva. Esta correspondencia, luego de algún tiempo, se inactivaba completamente y se pasaba al archivo que custodiaba María del Carmen Martínez Resto. No encontraron nada relacionado a la Certificación o cualquier documento relacionado al retiro del Dr. Rosselló. La búsqueda la hizo el 21 de abril de 2004. (TE págs. 92-95).
7. Lydia Julia Betancourt Martínez (TE, 30 de noviembre de 2005, págs. 98-107)
Para el 2004 trabajaba en ASSMCA como Secretaria de la Oficina del Administrador. En abril de 2004, su supervisora, la Leda. Carmen Graulau, le solicitó que buscara en los archivos de los años 1999 al 2001 documentación relacionada a la Certificación. Buscó en las áreas de archivo y en la Oficina del Administrador en los archivos correspondientes a los años 1999 y 2000. No encontró el documento que se le solicitó. Preparó una certificación (Exhibit 6 del Pueblo) en la cual informó las gestiones realizadas y que no encontró documento alguno sobre el asunto. (TE págs. 98-101).
*729 En el contrainterrogatorio indicó que comenzó a trabajar bajo la supervisión de la Leda. Carmen Graulau en el 2003 y conoció a la Sra. Carmen Haddock. (TE pág.102). No sabe si el Dr. Acevedo se llevó sus archivos. (TEpág. 105).
8. Alberto Santana Rosa (TE, 30 de noviembre de 2005, págs. 107-131)
Se desempeñaba en ASSMCA hacía cerca de veinte años y trabajó bajo la supervisión del Dr. Acevedo. Para diciembre de 2000 se desempeñaba como Supervisor del Área de Relaciones Laborales y Servicios al Empleado. Entre sus funciones estaba atender las peticiones sobre las solicitudes para retiro. La persona encargada de orientar aquellas personas que deseaban recibir información sobre retiro era la Sra. Virgen Meléndez, a quien él supervisaba. (TE págs. 108-110).
Para diciembre de 2000, el Administrador de la Agencia era el Dr. Acevedo y la Sra. Carmen I. Haddock Cardona (Sra. Haddock) era la Directora de Recursos Humanos. Ésta era su supervisora. En ningún momento se le dirigió o solicitó información del plan de retiro del Dr. Rosselló de paite del Administrador o de la Sra. Haddock. Tampoco tuvo conocimiento de que la Sra. Virgen Meléndez o cualquier otra persona bajo su supervisión tramitara alguna certificación o algún otro documento relacionado con un plan de retiro del Dr. Rosselló. La Sra. Haddock no le informó sobre la Certificación. (TE págs. 110-112).
Vio la Certificación en los periódicos y en los procedimientos legales. La Certificación no se tramitó por él ni en su oficina, ni tiene conocimiento de que alguno de sus empleados la haya tramitado. Reconoció que las firmas en la Certificación son de la Sra. Haddock y del Dr. Acevedo. (TE págs. 114-116).
La Certificación no se originó en su oficina, tampoco estaba en el formato regular, pues para esos fines se utiliza otro encabezamiento. Tampoco el contenido era el que contenían las certificaciones que ellos trabajaban. La Certificación contenía una equivalencia de puesto en la que ellos no entraban. No vio la Certificación cuando se emitió en el año 2000. (TE págs. 117-119).
En el contrainterrogatorio indicó que la Certificación está en singular y en ésta se dice “por la presente certifico”. Quien certificaba lo contenido en el documento era la Sra. Haddock y no el Dr. Acevedo, quien dio el visto bueno. La Sra. Haddock no fue acusada. (TE págs. 120-121).
Considera que la Sra. Haddock es una persona responsable y no tiene información de que se prestara para fabricar documentos. Ésta no tenía que pedirle permiso para hacer las cosas. Ella tenía la discreción de atender cualquier solicitud de la Oficina del Gobernador personalmente. No tenía conocimiento de que el contenido de la Certificación fuera falso. (TE págs. 122-125).
En el redirecto indicó que la Oficina de Clasificación y Retribución es la encargada de hacer las equivalencias de puesto. (TE pág. 129). En el recontrainterrogatorio indicó que la Coordinadora de Retiro de AMSSCA sólo intervenía con personas que eran empleados de AMSSCA. Para el 2000, el Dr. Rosselló no era empleado de AMSSCA. (TE págs. 130-132).
9. Hilda O’Neill Borrero (TE, 30 de noviembre de 2005, págs. 132-142)
Se desempeñaba en ASSMCA como Gerente Auxiliar de Finanzas y en términos prácticos era Ayudante del Director de Finanzas. Trabajaba en ASSMCA hacía más de veinte años. Entre otros asuntos, la Oficina de Finanzas era la que le correspondía certificar cuando una persona trabaja por contrato en el Hospital de Psiquiatría. En el 2000, eso también era así. Para certificar los trabajos por contrato necesitan ver el contrato y los comprobantes de pago. (TE págs. 133-134).
*730 No sabía a quién estaba adscrito el Hospital de Psiquiatría para los años 1962, 1963 y 1964. Sabía que antes de crearse ASSMCA, el Hospital de Psiquiatría estaba bajo el área de Salud Mental del Departamento de Salud y en el 1993 pasó a ASSMCA. (TE pág. 135).
Conocía a la Sra. Haddock como Directora de Recursos Humanos para el 2000. No se suponía que el Area de Recursos Humanos certificara las labores prestadas por contrato. Esas certificaciones se preparaban por la Oficina de Finanzas y las firmaban el Director de Finanzas o ella. (TE pág. 136).
La Certificación no fue preparada en su oficina. No se suponía que la Directora de Recursos Humanos hiciera esa certificación y nunca había visto una certificación que tuviera la firma del Administrador. Nunca había visto una certificación de labores prestadas por contrato firmada por la Directora de Recursos Humanos. La Certificación no se parecía a la que ellos preparaban, ya que ellos debían detallar cuánto cobró por hora, la cantidad de horas que trabajó a la semana y en el mes. (TE págs. 137-139).
En el contrainterrogatorio indicó que nunca había recibido solicitudes de certificación directamente de la Oficina del Gobernador. Esta fue una situación extraordinaria. (TE pág. 140). En el redirecto expresó que para diciembre de 2000 no se le solicitó una certificación para el Dr. Rosselló, ni de parte del Administrador ni de la Sra. Haddock. (TE pág. 143).
10. Iván O’Neill León (TE, 30 de noviembre de 2005, págs. 144-154)
Laboraba en ASSMCA hacía veintidós años. Para el 2000 trabajaba en la agencia. Se desempeñaba en la Unidad de Clasificación y Retribución de la Oficina de Recursos Humanos; en esa área llevaba dieciocho años. Era el supervisor de la unidad y para el 2000 su supervisora era la Sra. Haddock. A su unidad le correspondía hacer las equivalencias de los puestos. Una de las instancias en que se hacía equivalencias era cuando una persona había trabajado por contrato, que se analizaba si esas funciones equivalían a las de un puesto. (TE págs. 144-146).
Nunca había visto la Certificación. Lo contenido en ésta sobre el puesto de Asistente de Grupo de Terapia y Liderato era una equivalencia. La equivalencia contenida en la Certificación no la hizo él. El puesto que se mencionaba en ésta lo buscaron y no existía en la agencia esa clase. El puesto de Asistente de Grupos de Terapias no aparecía ni en el plan de clasificación actual de la agencia, ni en ninguno de los anteriores.' (TE págs. 146-150).
En el recontrainterrogatorio indicó que conoció a la Sra. Haddock como la Directora de Recursos Humanos y ésta era su ex jefa. No tiene ninguna duda de la capacidad profesional de la Sra. Haddock, (TE pág. 153).
11. Virgen Meléndez Díaz (TE, 30 de noviembre de 2005, págs. 154-164)
Trabajaba en ASSMCA hacía veintisiete años y medio. Laboró en la Oficina de Recursos Humanos en Servicios a Empleados. Su labor era coordinar los asuntos de retiro y orientar a los empleados que se iban a jubilar y se les preparaba una hoja de servicios. A los empleados que se iban a jubilar de otras agencias y habían trabajado en ASSMCA se les preparaba una certificación que venía a ser una hoja de servicio. Se certificaba la clasificación, los años de servicio, los sueldos y la aportación que se hacia al Sistema de Retiro. Su división trabajaba con empleados regulares, no con empleados que trabajaron por contrato, eso lo trabajaba la División de Contratos, que quedaba fuera del Área de Recursos Humanos. (TE págs. 155-158).
Para el 2000, su Supervisor Inmediato era el Sr. Alberto Santana y la Sra. Haddock dirigía la Oficina de Recursos Humanos. La División de Contratos no estaba bajo la supervisión de la Sra. Haddock. Las certificaciones que ella hacía pasaban al Área de Finanzas y las firmaba el Sr. Miguel González. Estas *731 certificaciones no las firmaba el Administrador, nunca había visto ninguna firmada por el Administrador. (TE págs. 158-159).
No había visto antes la Certificación. Ésta no se hizo en su división. A ella no se le pidió información sobre el trabajo del Dr. Rosselló, ni ningún documento o gestión. No podía declarar sobre el contenido de la Certificación, ya que no participó en su preparación y no sabe cómo se hizo. (TE págs. 160-163).
12. Myrna Maldonado Negrón TE, 30 de noviembre de 2005, págs. 165-177)
Trabajaba para ASSMCA hacía catorce años. Para diciembre de 2000 se desempeñaba como Secretaria Ejecutiva en la Oficina de Recursos Humanos. Era Secretaria de la Sra. Haddock. Entre sus funciones se encontraba el recibo de toda la correspondencia. Toda la correspondencia que se recibía se registraba en un libro y se enumeraba. Toda la correspondencia que llegaba pasaba por sus manos. (TE págs. 166-167). Nunca pasó por sus manos correspondencia relacionada al retiro del Dr. Rosselló. No pasó ninguna correspondencia interna o externa con relación al Dr. Rosselló. (TE págs. 170-171).
La Certificación tiene las filmas de la Sra. Haddock y del Dr. Acevedo. Para el 15 de diciembre de 2000 no vio la Certificación, la vio por primera vez en la prensa. Se sorprendió cuando la vio, ya que no se acostumbraba a hacer una certificación de esta forma en la Oficina de Recursos Humanos. Había una hoja de servicios que tenía una codificación en la que se certificaban los años de servicios. No sabía porqué la Sra. Haddock firmó la Certificación. Ella no preparó la Certificación ni sabe quién la preparó. La Sra. Haddock nunca le comunicó nada en relación a la Certificación. (TE págs. 171-174).
En el contrainterrogatorio expresó que no recordaba si se ausentó durante la primera y segunda semana de diciembre de 2000. Cuando ella se ausentaba, la Sra. Eva. Esquilín la sustituía. Aunque no era común, el Dr. Acevedo podía filmar cualquier certificación de años de servicio. (TE págs. 176-177).
13. Lourdes M. Morales Cales (TE, 30 de noviembre de 2005, págs. 177-180)
Laboraba en ASSMCA desde el 1993 cuando ocurrió la fusión entre Salud Mental y DESCA. Conocía a María del Carmen Martínez Resto. Para abril de 2004 llevaron a cabo una búsqueda sobre documentos relacionados al Dr. Rosselló por instrucciones del Sr. Alberto Santana. Primero buscó en la Oficina de Recursos Humanos en el archivo de expedientes de personal, luego en cualquier otro lugar que hubiere expedientes y después en el segundo piso con la Sra. María Martínez, expediente por expediente. No encontró ningún documento, ningún expediente que dijera que el Dr. Rosselló hubiera trabajado, ni ningún documento relacionado a una solicitud de retiro del Dr. Rosselló. (TE págs. 178-180).
14. Hedga J. García Cruz (TE, 30 de noviembre de 2005, págs. 180-185)
Trabajó en la Oficina de Conservación y Disposición de Documentos del Departamento de Hacienda. Su oficina tenía la responsabilidad de custodial y guarda los documentos del Departamento de Hacienda y todas las agencias cuyos fondos estaban bajo el Departamento de Hacienda. (TE pág. 181).
Hizo una búsqueda para ver si había evidencia de que el Dr. Rosselló trabajó en el Departamento de Salud para los años 1962, 1963 y 1964. Al hacer la búsqueda no se localizó en las nóminas de sueldos regulares, sueldos especiales, ni en nóminas a jornal, ni registro alguno que indicara que el Dr. Rosselló había trabajado. Hizo una certificación a esos efectos (Exhibit 8 del Pueblo). (TE pág. 183).
En el contrainterrogatorio indicó que si el Dr. Rosselló hubiera prestado servicios en un programa de la Escuela de Medicina de la Universidad de Puerto Rico, no hubiera aparecido en las nóminas del Departamento *732 de Salud. (TE pág. 184) En el redirecto declaró que la Universidad de Puerto Rico es una entidad autónoma y emite sus propios cheques. (TE pág. 185).
15. Leda. Ivette Molina Rivera (TE, 1 de diciembre de 2005, págs. 5-42)
Para diciembre de 2000 era Directora Ejecutiva del Hospital de Psiquiatría. El hospital estaba bajo ASSMCA y el Administrador de la Agencia era el Dr. Acevedo. Su supervisora para esa época era la Dra. Olga Montalvo, Sub Administradora de ASSMCA. (TE págs. 5-8).
Entre noviembre y diciembre de 2000 llegó a su oficina una certificación para que ella la firmara, sobre trabajos llevados a cabo por el Dr. Rosselló para los años 1962, 1963 y 1964. El documento llegó por mensajero de la Oficina Central de ASSMCA. No recordaba de qué oficina. (TE págs. 8-9). Luego que recibió el documento, llamó a la Dra. Montalvo y le explicó sobre la certificación que había recibido. Ésta le dijo que desconocía la misma. La Dra. Montalvo le dijo que si no tenía la documentación ni evidencia para corroborar la información que no la firmara. La Leda. Molina le dijo que iba a devolver el documento y la Dra. Montalvo estuvo de acuerdo. El documento vino solo, con una hoja de trámite. El documento que recibió era parecido a la Certificación, pero no igual. No firmó el documento y lo devolvió por mensajero a la oficina central. (TE págs. 10-14).
En el 2004 se enteró por la prensa de la Certificación y la Dra. Montalvo la llamó y le preguntó si ella había firmado el documento y ella le contestó que no lo había firmado. En el 2004 mencionaron que había una certificación firmada por ella. La defensa le presentó una comunicación en la que aparecía una firma como la de ella, pero que no era su firma, ella no conocía ese documento (Exhibit 10 del Pueblo). El documento no estaba en el tipo de papel que se usaba en el Hospital. El texto del documento le pareció un poco absurdo. El Exhibit 10 es una carta que dice que ella había recibido información de los empleados de ASSMCA que habían trabajado en el Hospital de Psiquiatría para la época de los 60 y que esos empleados certificaban que el Dr. Rosselló había trabajado allí durante los veranos de 1962 al 1966. (TE págs. 15-19). El documento tiene, además, el nombre del Dr. Acevedo, pero no podía decir que la firma es de él. La primera vez que vio el documento fue cuando el abogado defensor del Dr. Acevedo se lo mostró en la vista preliminar. (TE pág. 21).
En el contrainterrogatorio expresó que el Dr. Acevedo pudo haber pensado que la firma que tenía el documento era la de ella. El Dr. Acevedo no tenía que llamar a cada persona que le enviara un documento para preguntarle si esa es su firma antes de darle el visto bueno. (TE pág. 28). Sería mucho y no tiene evidencia alguna de que el Dr. Acevedo supiera que su firma fuera falsificada. No cree que el Dr. Acevedo le hubiera entregado a su abogado un documento para usarlo en una vista judicial sabiendo que su firma había sido falsificada. (TE págs. 28-29).
16. Dra. Awilda Montalvo Montalvo (TE, 1 de diciembre de 2005, págs. 43-50)
En el 2000 era Sub Administradora de ASSMCA y la nombró la Dra. Carmen Feliciano de Melecio con el consentimiento del Dr. Acevedo. Conoció a la Leda. Ivette Molina porque era la Directora Ejecutiva del Hospital' de Psiquiatría y ella era su supervisora para el 2000. En diciembre de 2000, ésta la llamó y le informó sobre una certificación que había recibido sobre labores prestadas por el Dr. Rosselló. Ella no tenía conocimiento sobre la misma. Le dijo que si tenía la evidencia que la firmara, si no tenía la información que la devolviera al lugar de su origen. (TE págs. 44-46).
Luego se enteró por la prensa de que había una certificación firmada por la Leda. Molina. La llamó y ésta le informó que ella nunca había firmado la certificación. La Leda. Molina no envió la certificación a su oficina y ella nunca vio la certificación. Además de la Leda. Molina, nadie le había hablado sobre la certificación. (TE págs.. 47-48).
*733 17. Leda. Marisol Marchand Castro (TE, 1 de diciembre de 2005, págs. 55-76)
Para junio de 2004 se desempeñaba como Administradora de la Administración de los Sistemas de Retiro del Gobierno de Puerto Rico. Se desempeñó en ese cargo de febrero de 2001 hasta diciembre de 2004. Mientras desempeñó ese cargo se llevó a cabo el ajuste de la pensión del Dr. Rosselló. (TE págs. 55-56).
El ajuste de la pensión del Dr. Rosselló se originó porque el Secretario del Departamento de Salud, Dr. Johnny Rullán (Dr. Rullán), solicitó se dejara sin efecto la Certificación, que fue emitida por ASSMCA el 15 de diciembre de 2000. A raíz de la solicitud del Secretario de Salud se inició el proceso para revisar la pensión del Dr. Rosselló. (TEpág. 57).
La petición del Dr. Rullán la motivó un informe periodístico en que se le imputaban interrogantes sobre el asunto de la pensión. El efecto que tenía dejar sin efecto la Certificación era que, al hacer los cálculos sin el tiempo de servicio contenido en la misma, los años de servicios del Dr. Rosselló totalizaban 29.25. (TE págs. 57-58).
El procedimiento de reajuste consistió en notificar al Dr. Rosselló que se iba a llevar a cabo el procedimiento, que presentara toda la evidencia que él entendiera era pertinente y que debía ser considerada por la Administración de Retiro, antes de que se tomara la decisión. Luego de las comunicaciones de parte de Retiro y del Dr. Rosselló, el 23 de junio de 2004, la Administración tomó una decisión y se le notificó al Dr. Rosselló. Éste sometió varios documentos y declaraciones juradas, pero no sometió contratos de servicios profesionales de 1962, 1963 ni 1964. (TE págs. 59-62).
En el contrainterrogatorio expresó que el Dr. Rosselló presentó declaraciones juradas de personas que no eran él. En el redirecto declaró que como resultado del proceso administrativo se concluyó que procedía dejar- sin efecto la Certificación y por consiguiente se llevó a cabo un ajuste de la pensión. (TE págs. 74-75).
18. Benjamín Pérez Martínez (TE, 1 de diciembre de 2005, págs. 76-85)
Está jubilado. Laboró en ORHELA, antes OCALARH, antes OCAP. Estas agencias administran las Leyes de Recursos Humanos del Gobierno. Trabajó desde 1985 al 1998 y luego cuatro años adicionales a jomada parcial. (TEpág. 77).
Presentó una certificación (Exhibit 11 del Pueblo) de que buscó el puesto de Asistente de Grupo de Terapias y Liderato en las asignaciones de clases de puesto para los años 1959 en adelante y no encontró un puesto clasificado como Asistente de Grupo de Terapias y Liderato. Para el 1962, un empleado con bachillerato ganaba de $250.00 a $300.00 mensuales. (TE págs. 79-81).
En el contrainterrogatorio expresó que la certificación que hizo era para el Gobierno Central, no incluia la Universidad. (TEpág. 81).
19. Luis Ángel Crespo Nieves (TE, 1 de diciembre de 2005, págs. 85-94)
Está jubilado desde el 1975. Trabajó para el Departamento de Agricultura y, anteriormente, para el Departamento de Recreación y Deportes. (TE pág. 85).
En el 1962 trabajaba para la Administración de Parques y Recreo como Oficial Administrativo. Fue a los Juegos Centroamericanos de Jamaica en 1962 como Oficial Pagador de la delegación. En la delegación de tenis estaba el Dr. Rosselló. (TE págs. 86-88).
*734 En el contrainterrogatorio expresó que los Juegos usualmente toman 15 días, en este caso de principios a mediados de agosto de 1962. En 1962 no había Ley u Orden Administrativa que concediera licencia a los atletas. Los atletas pedían vacaciones para las actividades deportivas. (TE pág. 91).
20. Juan A. Fiores Galarza (TE, 1 de diciembre de 2005, págs. 94-98)
Era Secretario de Hacienda para mayo de 2004. A solicitud del Secretario de Salud, Dr. Rullán, hicieron una búsqueda exhaustiva en el Departamento de Hacienda relacionada a desembolsos hechos en 1962, 1963 y 1964 al Dr. Rosselló. Se preparó una certificación sobre el resultado de la búsqueda (Exhibit 12 del Pueblo). (TE pág. 95).
En el contrainterrogatorio expresó que no buscaron cheques de la Universidad de Puerto Rico, sólo Gobierno Central. (TE pág. 98).
21. Felicita Díaz Sambolín (TE, 1 de diciembre de 2005, págs. 98-129)
Trabajaba en la Administración de los Sistemas de Retiro como Administradora Auxiliar. Hizo unas cartas a unas Universidades en Estados Unidos para que le certificaran si el Dr. Rosselló había estudiado allí por las fechas que se mencionan en la Certificación. (TE pág. 98). Recibió contestación a sus caitas. (TE pág. 102).
22. Dra. Carmen Feliciano de Melecio (TE, 1 de diciembre de 2005, págs. 131-137)
Se admitió declaración jurada prestada por la Dra. Carmen Feliciano de Melecio el 9 de marzo de 2005 ante el Fiscal Especial Independiente Rubén Guzmán Torres y se leyó al jurado.
La testigo estaba retirada para la fecha de la declaración, pero para diciembre de 2000 ocupaba el puesto de Secretaria del Departamento de Salud. Ocupó el puesto de 16 de septiembre de 1993 al 31 de diciembre de 2000. Su supervisor inmediato era el Gobernador, el Dr. Rosselló. (TE págs. 132-133).
Conoció al Dr. Acevedo como Asesor de la Legislatura y en Salud Mental, donde se desempeñaba como Psicólogo. Ella fue la que lo nombró como Administrador de ASSMCA para el 1997. A la Sra. Haddock la conocía de vista. Presume que la nombró el Dr. Acevedo, quien nombró su personal de confianza. No sabía de donde provenía. (TE pág. 133).
No conocía la Certificación. La vio por primera vez en la Oficina del Fiscal Especial Independiente. Lo que conocía del asunto era que a finales del año 2000 la llamó la Sra. Angie Rivera (Sra. Rivera), Ayudante del Gobernador, para informarle que estaba solicitando el historial de trabajo en las agencias que había trabajado el Dr. Rosselló. Se había comunicado con el Departamento de Salud, el Recinto de Ciencias Médicas de la Universidad y el Dr. Rosselló había trabajado unos veranos en el Hospital del Psiquiatría. La Dra. Feliciano le informó que en cuanto a lo del Hospital de Psiquiatría, que entendía que la Ley que creó ASSMCA ordenaba que todos los expedientes y documentación de DESCA y Salud Mental pasaran a ASSMCA, por lo que debía comunicarse con el Dr. Acevedo. (TE pág. 134).
Algún tiempo después, la Sra. Rivera le llamó indicando que no había recibido la información. La Dra. Feliciano llamó a la Dra. Awilda Montalvo para darle seguimiento, ésta le dijo que la información que solicitaba era de mucho tiempo y que eso tardaba. No recordaba que la Sra. Rivera le hablara más sobre el asunto, ni le mencionó los documentos necesarios para el trámite. (TE págs. 135-136).
B. RESUMEN DE LA PRUEBA PRESENTADA POR LA DEFENSA
1. Dr. Ramón Alonso Santiago (TE, 1 de diciembre de 2005, págs. 139-163)
*735 Es Doctor en Psiquiatría. En los 60, el Dr. Juan A. Rosselló, padre del Dr. Rosselló, era el Director del Departamento de Psiquiatría de la Escuela de Medicina de la Universidad de Puerto Rico. Hubo un acuerdo entre la Escuela de Medicina, el Departamento de Psiquiatría y el Departamento de Salud para utilizar las facilidades. (TEpágs. 140-143).
Desde julio de 1960 hasta el 1967 trabajó en un puesto Regular de Psiquiatra Clínico. Conocía al Dr. Rosselló desde el 1957, ya que se reunía el grupo de residentes con el Dr. Juan Rosselló en la residencia de éste para discutir nuevos artículos de revistas y “journals” sobre la profesión. El Dr. Rosselló entraba y saludaba con su atuendo de tenis. (TE págs. 143-145).
Durante los años 1962, 1963, 1964, 1965 y 1966 vio al Dr. Rosselló en más de una ocasión. Había tres sesiones de adiestramiento de estudiantes de la Escuela de Medicina de Tercero y Cuarto año con Residentes de Psiquiatría. El tiempo compensatorio era cuando una persona “no podía trabajar algunos días, podía reponer ese tiempo después”. (TE págs. 146-148).
En el contrainterrogatorio expresó que en 1962, 1963 y 1964, vio al Dr. Rosselló varias veces en distintas áreas del Hospital de Psiquiatría. No podía precisar número de veces que lo vio, menos de cinco veces. Lo vio por los pasillos. No lo vio desempeñando tareas. (TE págs. 154-156).
En el 1962, el Dr. Rosselló se graduó de High School. En la solicitud de empleo de 1966, aparecía en blanco el espacio de experiencia de trabajo previo. En la pregunta sobre si había trabajado anteriormente en la Universidad aparecía: No. (TEpágs. 159-160).
2. Carmen Gloria Despiau Bravo (TE, 7 de diciembre de 2005, págs. 7-47)
Era retirada del Gobierno, fue Trabajadora Sicosocial y Psiquiátrica Social con Maestría. Conoció al Dr. Juan Rosselló en el 1950 en un programa del Departamento de Salud. Luego éste la invitó a que fuera a trabajar con él en la Escuela de Medicina. Comenzaron en el Hospital Municipal en el Departamento de Medicina de la Escuela de Medicina y no había Departamento de Psiquiatría. En 1955 ó 1956 se mudaron para el Hospital de Psiquiatría. Estuvo en el Hospital de Psiquiatría hasta los años 60, 1964 ó 1965. Después pasó en la misma Escuela de Medicina a trabajar con el Dr. Díaz Rivera. (TE págs. 9-11).
Conoció al Dr. Rosselló. El Dr. Juan Rosselló la invitaba a su casa y conoció a su familia. Vio al Dr. Rosselló trabajando como estudiante en el Hospital de Psiquiatría, él iba a saludar a su papá. Para esa época estudiaba en Estados Unidos. No podía decir en qué meses era que lo veía, lo veía en verano y fuera de verano. Prestaba servicio, pero ella no sabía si cobraba porque no lo vio cobrando. (TE págs. 12-13).
Se estipuló que para el 1962 había un contrato de servicios profesionales y consultivos entre el Departamento de Salud y la Universidad de Puerto Rico, y había un acuerdo de cooperación entre la División de Rehabilitación Vocacional del Departamento de Educación y el Departamento de Salud. (TE pág. 14).
Ella no era empleada del Departamento de Salud, era de la Escuela de Medicina. Había fondos federales de propuestas para pagar a los estudiantes de Medicina que venían en verano a hacer la práctica. (TE pág. 16).
En el contrainterrogatorio expresó que el Dr. Juan Rosselló le dedicó un libro sobre el asunto de la Escuela de Medicina y el Departamento de Salud. Fue amiga del Dr. Juan Rosselló, el Dr. Rosselló y Doña Hill Rosselló y se llamaban de vez en cuando. (TE pág. 18).
Se fue a trabajar al Hospital de Psiquiatría para el 1954. (TE pág. 23). No recuerda cuándo dejó de trabajar en el Hospital de Psiquiatría. Trabajó como diez años. (TE pág. 25). No puede asegurar que vio al Dr. Rosselló *736 trabajando, lo vio que iba a ver a su papá. No lo vio trabajando. (TE págs. 25-26). No puede precisar el año que lo vio. (TE pág. 28).
En tres ocasiones fue el Ledo. Tomás Rivera Schatz a su casa. Le dijeron que si podía prestar una declaración jurada. Le trajeron la declaración jurada para que la femara. (TE págs. 30-31). Ella se ofreció a prestar la declaración jurada, porque ella era agradecida y el padre del Dr. Rosselló se portó bien con ella. (TE pág. 33).
En el redirecto expresó que no conoce al Dr. Acevedo y nunca lo había visto. (TE pág.42).
En el recontrainterrogatorio expresó que lo que decía en la declaración jurada no era del todo correcto. No podía precisar meses ni años. (TE pág. 45).
3. Carmen I. Haddock Cardona (TE, 8 de diciembre de 2005, págs. 1-170)
La Certificación es un documento firmado por ella. El Exhibit 3 de la defensa es una carta firmada por ella en respuesta a una comunicación dirigida a su persona por la Leda. Carmen Graulau Serrano, quien era Ayudante Especial del Dr. Rullán, Secretario de Salud. (TE págs. 5-6).
Firmó la Certificación en diciembre de 2000 sobre alegados trabajos del Dr. Rosselló en los meses de los años 1962, 1963 y 1964. No hubiera firmado la Certificación si no hubiese tenido unos documentos que reconocían los períodos que estaban incluidos en la Certificación. Desconoce dónde están los documentos que evidenciaba lo que ella certificó. (TE págs. 12-14).
En el contrainterrogatorio expresó que el Exhibit 17 del Pueblo era la comunicación que se le cursó a ella en respuesta a su comunicación. (TE págs. 15-16). Hubo una reunión con el Sr. Alberto Santana y la Leda. Graulau. En esa reunión le solicitaban lo mismo que le estaban solicitando en la caita. (TE págs. 18-20). En esa reunión indicó que no tenía copia de los documentos y aceptó que la caita entraba en eso. Lo que la Leda. Graulau le solicitó fue que le explicara las circunstancias por las cuales ella certifica y copia de los documentos. (TE pág. 21).
En la caita no explicó quién le trajo esa Certificación, ni quién le trajo los documentos. No dijo que le sacó copia a los documentos. En la carta no dijo dónde los guardó. En la comunicación verbal que tuvo no le preguntaron quién le entregó esos documentos. (TE págs. 23-24). En la Certificación, la otra firma era la del Dr. Acevedo. (TE pág. 26).
Cuando ella empezó a trabajar para ASSMCA, el Dr. Acevedo trabajaba en dicho lugar y era el Administrador. El Dr. Acevedo la trajo a la agencia y ella era su persona de confianza. (TE págs. 28-29).
La Certificación tenía su firma, el visto bueno del Dr. Acevedo, Administrador, y el sello. Este documento exactamente como está redactado y según lo acaba de leer no fue lo que preparó. (TE pág. 30). No sabe quién redactó ese documento. El documento que ella firmó llegó a ella por medio del Dr. Acevedo. (TE pág. 32). Las palabras no eran exactamente como estaban en el documento. (TE pág. 33). El Dr. Acevedo le indicó que la información debía ser preparada de esta manera. (TE pág. 34). Cuando el fiscal le preguntó que si el documento no estaba de la manera que ella lo había hecho, contestó: Exacto. (TE pág. 34).
Sobre la Certificación declaró lo siguiente:

“FEI:

Okay. Pero, espérece, usted les dijo a las Damas y Caballeros del Jurado que usted preparó una Certificación parecida a ésta. Y usted le explicó.

*737
T:

Exacto.

FEI:

Se la dio, ¿a quién?

T:

Al Dr. José Acevedo.

FEI:

Al doctor, al acusado.

T:

Al Administrador.

FEI:

Al tiempo él volvió con esa.

T:

Exacto.

FEI:

Con esa.

T:

Ujúm.

FEI:

Y le dijo a usted que aquella que usted había hecho, no la habían aceptado en Retiro. Correcto, ¿eso fue lo que le dijo a usted?

T:

No, esa terminología de que no había sido aceptada...

FEI:

¿Y cual fue la terminología?

T:

... en Retiro. Lo que yo mejor recuerdo fue, que él me mencionó Retiro.

FEI:

Por eso.

T:

Pero no que no fue aceptada.

FEI:

¿Y qué le dijo?

*738
T:

Sino en Retiro.

FEI:

Aja.

T:

...le habían indicado que debía ser presentada de esta manera. (TE págs. 34-35). ”

No había vuelto a ver la Certificación. Los documentos que ella vio para corroborar la información contenida en la Certificación llegaron a ella por medio del Dr. Acevedo, llegaron de parte de él. No recuerda si el Dr. Acevedo le llevó personalmente los documentos o si fue por medio de otra persona. (TE págs. 37-40). Esa correspondencia la recibió ella personalmente. (TE pág. 44). No recuerda si los recibió personalmente; probablemente los recibió de una de sus secretarias, pero no lo podía asegurar. (TE pág. 46).
Originalmente ella preparó un borrador sin nombre. Después ella preparó y firmó una certificación como Directora Ejecutiva III. Luego, el Dr. Acevedo le trajo otra certificación para su firma y ella la firmó como Directora de Recursos Humanos. No ha vuelto a ver las dos certificaciones. Para la fecha que filmó la Certificación, ella no era Directora de Recursos Humanos, era Directora Ejecutiva III. (TE págs. 51-56). No se percató hasta que salió publicado en la prensa, que ese no era su título. (TE pág. 57).
Cuando llegó la Certificación a ella, no tenía la firma del Administrador. La Certificación fue el documento que le trajo el Dr. Acevedo. (TE págs. 58-59). No vio que decía Directora de Recursos Humanos y se dio cuenta cuando salió en la prensa. (TE págs. 60-61). Luego ese documento pasó a la Oficina del Administrador para la firma de él como Administrador. Cuando firmó el documento se lo llevó al Dr. Acevedo para su firma. Se lo envió a su oficina. (TE págs. 62-63). La Certificación debía estar en los archivos del Administrador. (TE pág. 65).
El borrador lo hizo por un asesoramiento que le solicitó el Dr. Acevedo. Este le preguntó que cuál era el procedimiento si una persona tenía que radicar servicios que no ha cotizado al Sistema de Retiro. Aun cuando había coordinadora para los servicios de Retiro que llevaba años allí, ella lo podía asesorar. (TE págs. 65-67).
Originalmente cuando hizo el borrador no tenía nombre y no sabía ni de quién le hablaban. A base de lo que se le preguntó, hizo el borrador. El borrador se lo llevó el Dr. Acevedo. Posteriormente, el propio Dr. Acevedo fue quien le dio conocimiento de que la Certificación era para el Dr. Rosselló. (TE págs. 71-73).
Firmó el documento según se le presentó. (TE pág. 75). En su declaración jurada sobre porqué firmó la Certificación en su capacidad de Directora de Recursos Humanos, dijo que no podía dar una razón particular. Ella no podía darle una razón porque lo hizo inadvertidamente. No se dio cuenta de que faltaba al lado de la palabra “Directora” la palabra “Ejecutiva”. (TE págs. 79-80).
En su declaración jurada, a la pregunta que se le hizo sobre quién le había solicitado que firmara la Certificación como Directora de Recursos de la Oficina de Recursos Humanos, ella contestó que el Dr. Acevedo le había indicado que para propósitos de Retiro el documento debía ser certificado por la Oficina de Recursos Humanos. En el juicio declaró que nadie le solicitó que firmara como Directora de Recursos Humanos. (TE págs. 80-84).
No se percató que la palabra “Ejecutiva” no estaba al lado de Directora. No sabe si esta explicación está en su declaración jurada. Indicó en el juicio que no iba a leer esta declaración jurada tan larga. (TE págs. 87-88).
Los documentos que examinó para preparar la Certificación se los hizo llegar el Dr. Acevedo. No recuerda *739 cómo llegaron esos documentos. No eran contratos como se redactan hoy día; eran tres. Los documentos eran de una sola página. No eran documentos como el Exhibit 16 del Pueblo. No decían Contrato de Servicios Profesionales. Los documentos decían nombramiento. No ha vuelto a ver los documentos. Sobre el contenido de éstos, indicó que los $300.00 mensuales no estaban, pero sí estaba el título del puesto y que no recordaba más. (TEpágs. 89-94).
Sobre los $300.00 que estaban en la Certificación, declaró que cuando el Dr. Acevedo le indicó que de Retiro habían indicado que la información debía ser presentada de esa manera, entendió que en la misma Oficina de Retiro habían hecho la conversión de la información que se había reconocido por hora al salario mensual. (TE pág. 95).
Entendía que ya en Retiro habían revisado la certificación que ella había preparado originalmente y habían indicado que se presentara de esa manera. No le preguntó al Dr. Acevedo si lo de $300.00 había sido de Retiro. No la llamaron de Retiro para solicitarle corrección u otra certificación. Tampoco ella llamó a Retiro. Lo asumió. (TEpágs. 96-98).
En la Certificación, ella certificó que tenía unos contratos porque entendía que era un compromiso contractual que se desprendía del documento que examinó y partió de que la Certificación iba a recibirla Retiro junto con los documentos que usó para firmar la Certificación. Ella no llevó los documentos, por lo que no puede dar fe de que fuese así. (TEpágs. 99-103).
Este no fue el único caso que tuvieron que certificar con documentos provistos por el empleado. No solicitó el expediente del Dr. Rosselló. No hizo la gestión para solicitar los documentos y el expediente del Dr. Rosselló. (TEpágs. 103-105).
Del 1962 al 1964, ASSMCA no existía. Lo estaba certificando ASSMCA y no el Departamento de Salud. Anteriormente ella lo había tenido que certificar con otros empleados en situaciones similares. No pudo recordar-los nombres de éstos. No recordaba los nombres para el 1962, 1963 y 1964. (TE págs. 108-113).
Ella se comunicó con una persona que trabajaba en la agencia para el 2000 y había trabajado en el Hospital de Psiquiatría para la década del 60, la Sra. Felicita Cintrón Rodríguez, para conocer como se hacían los nombramientos y dónde podían estar los ai-chivos de documentos de esa época. Sólo habló con ella en una ocasión sobre este asunto y le dijo que el Dr. Rosselló había realizado trabajos en el Hospital de Psiquiatría como un líder recreativo y de la dificultad para obtener la información de los archivos. Como la Sra. Cintrón confirmó la información sobre el Dr. Rosselló y realmente la búsqueda de esos documentos no iba a valer la pena porque no iban a aparecer, eso le dio confianza para firmar la Certificación. Compartió con la Sra. Cintrón el contenido de los documentos contractuales. (TEpágs. 113-123).
No examinó otros documentos porque no se los trajeron. (TE págs. 124-125). No había visto un documento que especificara que el 27 de junio de 1962 el Dr. Rosselló se encontraba en Tennessee jugando tenis. Lo examinó hoy y salió en la prensa. (TE págs. 127-128). No sabía si el Dr. Rosselló estaba: el 19 de julio de 1962 en Saint Louis, el 13 de julio de 1962 en Mississippi, el 14 de julio de 1962 en Carolina del Norte, el 24 y 26 de julio de 1962 en Ohio, el 18 de julio de 1962 en Chicago, el 3 de agosto de 1962 en Michigan, el 9 de agosto de 1962 en Texas o el 13 y 14 de agosto de 1962 en Jamaica. Todas esas fechas concordaban con el verano de 1962. (TE págs. 128-130).
En el redirecto declaró que la posición de Director Ejecutivo III es de carrera y la de Directora de Recursos Humanos de confianza. Ella dejó de tener el título de Directora de Recursos Humanos en agosto del año 2000 porque prefirió beneficiarse de una reclasificación a la posición de Director Ejecutivo III que era de can-era. (TE pág. 137). Representaba al Director de la Oficina de Recursos Humanos en ausencia de éste y llevaba a cabo otras *740 tareas a fines. (TE pág. 139).
No le correspondía a ASSMCA certificar los trabajos en el Hospital de Psiquiatría, pero lo estaba haciendo. Le correspondía a AMSSCA emitir la certificación porque para el año 2000 el Hospital de Psiquiatría le pertenecía a AMSSCA. (TE pág. 149).
No tiene ninguna evidencia de que el Dr. Acevedo supiera de nada extraño o ilegal al emitir la Certificación. (TE pág. 151).
En el recontrainterrogatorio expresó que no es correcto que un Director de Agencia certifique algo que le conste que es falso. Es incorrecto e ilegal certificar datos que son falsos. Si los medios de esa Certificación eran falsos, la Certificación era ilegal, estaría incorrecto. (TE págs. 153-155). El visto bueno era una aprobación, endoso, revisión, a lo que se estaba certificando. (TE pág. 156, líneas 10-25). Ese visto bueno, era que no estaba incorrecto, no se negaba el contenido, ni reprobaba; significa que estaba completamente de acuerdo con lo que estaba ahí. (TE págs. 156-158).
Ella le había enviado al Dr. Acevedo una certificación preparada por ella y llevando las dos firmas, la de ella y la de él dando el visto bueno aprobado. (TE págs. 161-162).
El Exhibit 10 del Pueblo era una certificación con el visto bueno del Dr. Acevedo como Administrador. Ese documento nunca lo había visto. Su contenido no era parecido al contenido de la primera certificación que jamás volvió a ver. El documento tiene un logo de “Nuestros Niños Primero”. Desconoce si este logo era el logo de La Fortaleza. El papel timbrado de ASSMCA tenía ese logo también y entre los logos decía Hospital de Psiquiatría, Dr. Ramón Fernández Marín. La explicación para que el papel timbrado de ASSMCA tuviera arriba Hospital de Psiquiatría del Departamento de Salud era porque éste era una Institución de ASSMCA. No lo era para el 1962. (TE págs. 163-166).
Conoció a la Leda. Ivette Molina porque era la Directora Ejecutiva en el Hospital de Psiquiatría. (TE pág. 166). En la Certificación dice que el Dr. Rosselló llevaba a cabo labores equivalentes a un puesto de Asistente de Grupo de Terapia y Liderato y esto es una equivalencia. Establecer las equivalencias en las funciones lo hacía la Oficina de Clasificación y Retribución de ASSMCA y ella no lo consultó con esa Oficina. Tampoco comentó, ni habló con nadie de la Oficina de Contratos antes de firmar la Certificación. (TE págs. 166-169). El Dr. Acevedo, la Sra. Cintrón y ella eran los únicos en ASSMCA que sabían del asunto de la Certificación. (TE pág. 170).
C. RESUMEN DE LA PRUEBA DE REFUTACIÓN
1. Alexis Morales Fresse (TE, 7 de diciembre de 2005, págs. 49-72)
Trabaja en el Recinto de Ciencias Médicas de la Universidad de Puerto Rico como Director de Recursos Humanos en el Departamento de Gerencia del Capital Humano. Administraba el régimen de personal docente y no docente velando por la reglamentación institucional. Entre sus funciones está custodiar los expedientes de personal docente y no docente que ha trabajado en el Recinto de Ciencias Médicas de la Universidad de Puerto Rico. Custodia los expedientes del personal activo y, además, tienen almacenados los expedientes inactivos hasta cinco años después que la persona se ha ido. En un local privado tienen expedientes desde que se inició el Recinto de Ciencias Médicas, que inicialmente se llamaba Medicina Tropical. (TE págs. 49-51).
En el 2004 examinó el expediente que tiene el Recinto de Ciencias Médicas del Dr. Rosselló. (TE págs. 51-52). Preparó una certificación de los documentos que obran en el expediente del Dr. Rosselló en Ciencias Médicas (Exhibit 15 del Pueblo). (TE pág. 55). El contrato más remoto que había en el expediente era de 1 de julio de 1966 en el Departamento de Psiquiatría como asistente de investigación. Se ganaba $300.00 mensuales *741 por una jornada de 40 horas por un mes. (TE pág. 56).
El segundo contrato era de 1 de agosto de 1966, por un mes, con un sueldo de $300.00 como Auxiliar de Investigaciones. El próximo contrato era de 1 de agosto de 1967 hasta el 15 de septiembre de 1967, con un salario de $500.00 mensuales como Asistente de Investigaciones. (TE págs. 57-58).
El inciso 9 del Contrato de Servicios Personales de 1 de agosto de 1966 (Exhibit 16 del Pueblo), indicaba que la segunda paite hacía constar que nunca había trabajado en agencias, instrumentalidades o municipios del Estado Libre Asociado de Puerto Rico. La segunda parte era el Dr. Rosselló. (TE págs. 59-60).
2. Felicita Cintrón Rodríguez (TE, 8 de diciembre de 2005, págs. 171-196)
Estaba retirada de la Secretaría de Salud Mental desde el 1982. Al presente tiene un contrato por horas con ASSMCA para asesoramiento sobre servicios de salud mental y solicitud de fondos federales. Laboró en la Secretaría de Salud Mental por más de veinte años. Empezó trabajando en el Hospital de Psiquiatría en la sala con los pacientes, ya que tiene una Maestría en Trabajo Social y Psiquiátrico y otra en Administración Pública. Llevaba alrededor de diez años en esos contratos con ASSMCA. (TE págs. 174-175).
Para diciembre de 2000 trabajaba por contrato en ASSMCA y conoció a la Sra. Haddock, no porque su trabajo tuviera relación directa con ella, sino porque la veía en los pasillos. En diciembre de 2000 no tuvo conversación alguna con la Sra. Haddock. Se cruzaban en el pasillo y le contestaba el saludo. (TE págs. 175-177).
La Sra. Haddock nunca le preguntó si ella trabaja en el Hospital de Psiquiatría para los años 1962, 1963 y 1964. La Sra. Haddock no le preguntó dónde se almacenaban los expedientes de personal para esos años. Tampoco le preguntó sobre los contratos del Dr. Rosselló para los años 1962, 1963 y 1964. No le preguntó si el puesto de Asistente de Grupo de Terapia y Liderato existía para esa época. (TE págs. 177-178).
No ha tenido conversación alguna con el Dr. Acevedo sobre la pensión del Dr. Rosselló, ni los contratos del Dr. Rosselló. (TE pág. 179). Ella trabajaba como Trabajadora Social, no trabajaba con contratos, puestos o expedientes de personal. (TE pág. 181).
La Sra. Haddock no conversó con ella sobre la contratación de servicios y labores prestadas en los años 1962, 1963 y 1964 ni le ofreció información sobre el asunto. (TE págs. 181-182).
El Ministerio Público y la defensa sometieron su caso con la prueba señalada y ofrecieron sus informes al Jurado. Luego de evalúa la prueba desfilada, el Jurado halló culpable al Dr. Acevedo de los delitos tipificados en los Artículos 271 y 207 del Código Penal y 3.2 (c) de la Ley de Ética. El TPI condenó al Dr. Acevedo a cumplir condena de seis años de cárcel por el del Artículo 271 del Código Penal, consecutivos con un año por el delito del Artículo 207 del Código Penal y seis meses por el delito del Artículo 3.2 (c) de la Ley de Ética.
No conforme, el 18 de enero de 2006, el Dr. Acevedo presentó la apelación de epígrafe. En su alegato, el apelante argumentó los siguientes cuatro (4) errores: 

“1. La acusación por violación al Art. 271 del Código Penal de 1974 no imputa delito.

2. La conducta imputada como violación al Art. 271 del Código Penal de 1974 no constituía el delito de falsificación a la fecha de los hechos.

3. Insuficiencia de la evidencia presentada en el Juicio.

*742
4. Las Sentencias impuestas violan las disposiciones sobre concurso de delitos. ”

Las partes presentaron sus alegatos y una transcripción estipulada de la prueba testifical, por lo que el caso quedó sometido para nuestro dictamen. Analizados cuidadosamente los alegatos de las paites, los autos originales, la transcripción estipulada de la prueba oral y el derecho aplicable, resolvemos.
II
En el primer señalamiento de error, el apelante alega que la acusación presentada por el delito de infringir el Art. 271 del Código Penal no imputa delito porque no se alegó específicamente que él actuó con intención de defraudar a otra persona como se dispone en dicho artículo. No tiene razón.
En la referida acusación se le imputó lo siguiente:
“El referido acusado, JOSÉ ACEVEDO MARTÍNEZ, allá en o para el 15 de diciembre de 2000, en San Juan, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sub-Sección de Distrito de San Juan, y mientras se desempeñaba como Administrador de la Administración de Servicios de Salud Mental y Contra la Adicción (ASSMCA), a sabiendas, ilegal, voluntaria, maliciosa, intencional y criminalmente, hizo un escrito falso mediante el cual se creó un derecho. ”
La Regla 35 (c) de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 35 (c), establece que la acusación deberá contener una exposición de los hechos esenciales constitutivos del delito redactada en lenguaje sencillo, claro y conciso de tal manera que el acusado quede debidamente informado de los cargos en su contra y pueda preparar su defensa. No se exige que en dicha exposición se utilice un lenguaje estereotipado o técnico, ni que se sigan fielmente las palabras de la ley. Solamente se requiere que el contenido de la acusación exponga todos los hechos constitutivos del tipo delictivo. Pueblo v. Montero Luciano, 169 D.P.R. _ (2006), 2006 J.T.S. 167; Pueblo v. Calviño Cereijo, 110 D.P.R. 691, 693-694 (1982).
En el presente caso, la acusación presentada es suficiente en derecho. El apelante fue adecuadamente informado del cargo y de los hechos por las cuales estaba siendo procesado.
El Artículo 271 del Código Penal dispone que “[tjoda persona que con intención de defraudar a otra hiciere, en todo o en parte, un documento o escrito falso, mediante el cual se creare, transfiere, terminare o de otra forma afectare cualquier derecho, obligación o interés, o que falsamente altere, limitare, suprimiere o destruyere, total o parcialmente, uno verdadero. ” El elemento esencial en el delito de falsificación de documentos establecido en el Art. 271 del Código Penal es la intención de defraudar y tiene dos modalidades: (1) hacer en todo o en parte un documento, escrito o instrumento falso, y (2) alterar, imitar, suprimir o destruir total o parcialmente uno verdadero. Pueblo v. Uriel Álvarez, 112 D.P.R. 312, 321 n.4 (1982). Además de requerir la intención criminal general, este delito requiere la intención específica de defraudar a otra persona. Pueblo v. Flores Betancourt, 124 D.P.R. 867, 876(1989).
En el pliego acusatorio se especificó que el Dr. Acevedo “a sabiendas, ilegal, voluntaria, maliciosa, intencional y criminalmente, hizo un escrito falso mediante el cual se creó un derecho.” Aunque no se incluyó la frase “con intención de defraudar a otra”, de la propia acusación se desprende que la intención de defraudar fue porque intencionalmente el apelante hizo un escrito falso mediante el cual se creó un derecho. Así pues, la acusación cumple cabalmente con nuestro ordenamiento jurídico, por lo que resulta inmeritorio el argumento del apelante al respecto. Véase, Pueblo v. Montero Luciano, supra; Pueblo v. Calviño Cereijo, supra. Cf. Pueblo v. Meléndez Cartagena, 106 D.P.R. 338, 341-342 (1977).
III
En el segundo señalamiento de error, el apelante alega que la conducta imputada como violación al Art. 271 *743 del Código Penal se refiere al delito de falsificación ideológica en documentos públicos, lo que no es punible bajo dicha disposición. Aduce que aquí se trata de un documento genuino y verdadero suscrito por quienes lo filmaron, pero que contiene información que el apelante alegadamente sabía que era falsa.
Por su parte, el Ministerio Público alega que el apelante incurrió en falsedad material porque la prueba demostró que el apelante falsificó materialmente un documento público. Este acto de falsificación material alegadamente consistió en hacer completamente un documento falso -la Certificación-, en el cual el apelante intencionalmente hizo constar hechos que él conocía eran falsos y mediante el cual se creó un derecho: la adjudicación de una pensión de mayor cuantía al Dr. Rosselló. Resolvemos.
En la doctrina sobre falsificación de documentos existen dos tipos básicos de falsedad: falsedad material y falsedad ideológica. En la falsedad material se cambia la verdad mediante la alteración material de un documento, por ejemplo, al borrar la firma o añadir palabras o guarismos. Se trata de la imitación de un documento auténtico; el falsificador hace otro documento tan parecido al original que pasa por bueno. Recae en el documento mismo y puede consistir en hacerlo íntegramente o agregar o reemplazar parte del mismo. Por su parte, en la falsedad ideológica, el documento no es falso en sus condiciones de existencia; son falsas las ideas que se afirman como ciertas en el escrito. Mientras la falsedad material es perceptible por algún signo físico exterior, la falsedad ideológica no se aprecia por señas o indicios materiales. Pueblo v. Burgos Torres, 120 D.P.R. 709, 717-718 (1988). La definición de Miró Cardona de falsedad ideológica es que ésta “se integra cuando la alteración de la verdad recae en el contenido ideativo del documento. La misma implica una divergencia entre [la verdad real y] la verdad expresada en el documento. Cometen este delito el funcionario público, el Notario o quien venga obligado por la Ley a suscribir o autenticar un documento. Es obvio que el particular no puede incurrir en este delito excepto cuando coetáneamente forme el documento falso.” Id., a la pág. 716.
El Art. 271 del Código Penal incluye como delito la modalidad de falsedad material y no la de falsedad ideológica en documentos públicos o privados. A estos fines, el Tribunal Supremo expresó lo siguiente:

“En Puerto Rico, las acciones enunciadas en el Art. 272 del Código Penal, supra, son precisamente hacer, alterar, limitar, suprimir o destruir. Todas se refieren a la falsedad material, extrínseca o física. La idea de hacer no ofrece dificultad: se trata de la creación completa del documento. De no ser así, el hecho sólo sería una falsificación parcial, una alteración o adulteración. “Hacer” un documento será, por lo tanto, falsificar imitando los signos de autenticidad. “Alterar” será aprovechar los signos de autenticidad para referirlos a un contenido distinto. Las acciones que consisten en limitar, suprimir o destruir también responden al tipo de falsedad material. La supresión puede ser parcial y entonces se obra sobre el contenido que puede ser inútil, por ejemplo, al hacerlo ilegible de modo que no es posible entenderlo en su sentido específico. Por último, el documento se “destruye” cuando se da fin a su existencia material total o parcialmente. Quemar, romper o borrar, son una de las tantas maneras de destruir...

Dadas las expresiones que utilizó el legislador puertorriqueño, no cabe duda alguna de que estamos ante la falsedad material

Pueblo v. Burgos Torres, 120 D.P.R., a las págs. 719-720.
En este caso estamos ante la modalidad de falsedad ideológica. Veamos.
En específico, la Leda. Ivette Molina Rivera, quien se desempeñaba como Directora Ejecutiva del Hospital de Psiquiatría, testificó que en noviembre o diciembre de 2000 recibió de la Oficina Central de ASSMCA una certificación para que la filmara sobre los alegados trabajos del Dr. Rosselló en los años 1962, 1963 y 1964 sin evidencia para corroborar la información. Ella devolvió el documento sin firmarlo. (TE, 1 de diciembre de 2005, págs. 5-14). Agregó que la Certificación no estaba en el tipo de papel que se usaba en el Hospital y ella no hubiera *744 redactado el documento de esa forma. (TE págs. 15-20).
El Sr. Alberto Santana Rosa testificó que la Certificación no se originó en su oficina, no estaba en el formato regular porque se utilizaba otro encabezamiento y el contenido no era el que tenían las certificaciones que ellos trabajan. (TE, 30 de noviembre de 2005, págs. 117-119).
La Sra. Hilda O'Neill Borrero testificó que la Certificación no fue preparada en su oficina, no se suponía que la Directora de Recursos Humanos hiciera la Certificación, nunca había visto una certificación que tuviera la firma del Administrador y la Certificación no se parecía a la que ellos preparaban, ya que ellos debían detallar cuánto cobró por hora, la cantidad de horas que trabajó a la semana y al mes. (TE, 30 de noviembre de 2005, págs. 137-139).
La Sra. Myrna Maldonado Negrón testificó que se sorprendió cuando vio la Certificación, ya que no se acostumbraba a hacer una certificación de esa forma en la Oficina de Recursos Humanos y en dicha oficina hay una hoja de servicios que tenía una codificación en la cual se certifican los años de servicio. (TE, 30 de noviembre de 2005, págs. 171-172). Además, indicó que aunque no era común, el Dr. Acevedo podía femar cualquier certificación de años de servicio. (TE pág. 177).
Según lo declarado por los funcionarios y empleados gubernamentales que por razón de sus deberes y funciones preparaban certificaciones como la Certificación o proveían la información necesaria para el contenido de ésta, ninguno de ellos intervino en el trámite de preparar la Certificación.
Por último, la Sra. Haddock, Directora de Recursos Humanos de ASSMCA y quien era subalterna del Dr. Acevedo, declaró que ella preparó un borrador que se llevó el Dr. Acevedo. Luego, ella preparó y firmo una certificación como Directora Ejecutiva III y se la entregó al apelante. Posteriormente, el Dr. Acevedo le entregó otra certificación diferente a la que ella había redactado, la cual resultó ser la Certificación, y le indicó que hubo que hacer unos cambios a la primera a solicitud del Sistema de Retiro. Ella firmó la Certificación como Directora de Recursos Humanos, a pesar de que para esa fecha ella era Directora Ejecutiva III. (TE, 8 de diciembre de 2005, págs. 30-35, 71-88, 163-166).
En resumen, los testigos de cargo y defensa identificaron al Dr. Acevedo como la persona que preparó la Certificación. El análisis ponderado de la prueba presentada en el juicio demuestra que el documento al que se refiere la acusación -la Certificación-, es un documento público auténtico preparado por el apelante y firmado pol-la personas que aparecen firmándolo, el apelante y la Sra. Haddock. Este documento no es una imitación o falsificación de otro documento público, lo que constituiría falsificación material. La Certificación es un documento auténtico en el cual el apelante intencionalmente hizo declaraciones falsas sobre los supuestos servicios prestados por el Dr. Rosselló, lo que es falsedad ideológica.
“No existe en el Código penal puertorriqueño delito expreso definido, al menos como falsificación, en términos de falsedad ideológica... Corresponde a la Legislatura la última palabra sobre la creación de un delito de falsificación por afirmaciones falsas en documentos auténticos, públicos o privados.” Pueblo v. Burgos Torres, 120 D.P.R., a las págs. 722-723. Precisamente, en el Artículo 219 del Código Penal de 2004, 33 L.P.R.A. see. 4847 (Supl. 2007), se incorporó a nuestra jurisdicción el delito de falsificación de documentos en la modalidad de falsedad ideológica. Allí se estableció lo siguiente:

“Toda persona que con intención de defraudar haga, en un documento público o privado, declaraciones falsas concernientes a un hecho del cual el documento da fe y, cuando se trata de un documento privado, tenga efectos jurídicos en perjuicio de otra persona, incurrirá en delito grave de cuarto grado. ’’

Por lo tanto, se cometió este error y procede revocar la sentencia declarando culpable al apelante por este *745 cargo. Pueblo v. Burgos Torres, supra.
IV
En el tercer señalamiento de error se aduce que el Ministerio Público no probó mas allá de duda razonable que el apelante cometió los delitos que se le imputan. En vista del resultado al que hemos llegado en cuanto al señalamiento anterior, nos limitaremos a discutir lo referente a los delitos por infracciones a los Artículos 207 del Código Penal y 3.2 (c) de la Ley de Ética.
En nuestro ordenamiento constitucional, uno de los derechos fundamentales de los acusados es la presunción de inocencia. Sección 11 del Artículo II de Constitución del Estado Libre Asociado de Puerto Rico. Esta disposición constitucional “exige que toda convicción siempre esté sostenida por prueba que establezca más allá de duda razonable todos los elementos del delito y la conexión del acusado con los mismos. ” Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 760-761 (1985). Por su parte, la Regla 110 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R.110, incorporó esta norma. Allí se dispone que el acusado en un proceso criminal se presume inocente, mientras no se pruebe lo contrario, y de existir duda razonable sobre su culpabilidad, se le absolverá. Por tanto, el Ministerio Público está obligado a probar más allá de duda razonable la culpabilidad del acusado.
El estándar de prueba que se requiere para que se pueda sostener una convicción criminal es el que establece una certeza moral capaz de convencer sobre la concurrencia de todos los elementos del delito y la conexión del imputado con éstos. Pueblo v. Colón, Castillo, 140 D.P.R. 564, 581-582 (1996). Esta prueba tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupaciones o en un ánimo no prevenido. Pueblo v. Cabán Torres, 117 D.P.R. 645, 652 (1986).
La insatisfacción del juzgador con la prueba es lo que se conoce como duda razonable y fundada. Pueblo v. Rodríguez Román, 128 D.P.R. 121, 131 (1991). Sin embargo, esto “no significa que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. Sólo se exige que la prueba establezca aquella certeza moral que convence, que dirige la inteligencia y satisface la razón.” Pueblo v. Pagán, Ortiz, 130 D.P.R. 470, 480 (1992). Además, la Regla 10(C) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(C), establece que “para establecer un hecho no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza; sólo se exige la certeza o convicción moral en un ánimo no prevenido.”
Un acusado no tiene derecho a un juicio perfecto, sino a uno justo y que satisfaga las exigencias del debido proceso de ley. Véase, Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299, 381 (1991). Los procedimientos judiciales son dirigidos por y dependen de los seres humanos, por lo que están sujetos a errores. Sin embargo, por mandato constitucional, el deber de todos es aspirar y velar porque estos procesos sean justos e imparciales. Pueblo v. Santiago Lugo, 134 D.P.R. 623, 631 (1993).
En el caso de autos, según hemos visto, el Jurado halló al apelante culpable de los delitos de certificaciones falsas expedidas por funcionarios públicos (Art. 207 del Código Penal) y el delito tipificado en el Artículo 3.2 (c) de la Ley de Ética.
En primer lugar, el Alt. 207 del Código Penal castiga, por el delito de certificaciones falsas expedidas por funcionarios públicos, a “[t]odo funcionario o empleado público autorizado por la ley para expedir certificaciones u otros documentos, que expidiere como verdadera una certificación o documento conteniendo declaraciones que le constan ser falsas”.
El apelante sostiene que el Ministerio Público no desfiló prueba de que a él le constara que el contenido de la Certificación era falso. No tiene razón. Veamos.
*746 El Sr. Rafael García Álvarez, quien se desempeñaba como Administrador de Servicios de Salud en el Departamento de Salud, declaró que hizo una búsqueda en los archivos del Hospital de Psiquiatría y no había archivos para la década del 60 relacionados al Dr. Rosselló (TE, 30 de noviembre de 2005, págs. 12-19).
La Sra. Marilyn de Jesús Cruz, quien se desempeñaba en la División de Servicios al Empleado de la Oficina de Recursos Humanos del Departamento de Salud, declaró que el Dr. Rosselló no solicitó hoja de servicio alguna a su oficina. (TE, 30 de noviembre de 2005, págs. 41-45).
La Sra. Nydia Maritza Navarro Rodríguez, Directora de la Oficina de Contratos del Departamento de Salud, declaró que cualquier persona que haya trabajado en el Departamento de Salud por contrato e interese que se le acredite ese servicio, debe solicitar una certificación a su oficina. Buscó los registros de los contratos para los años 1962 a 1964 y no apareció contrato alguno del Dr. Rosselló. (TE, 30 de noviembre de 2005, págs. 50-52).
El Sr. Héctor Méndez Alvarado, Administrador de Documentos Públicos del Departamento de Salud, declaró que en el archivo inactivo del Departamento de Salud se guardan los documentos en un sólo expediente por persona. El examinó el expediente del Dr. Rosselló y éste sólo contiene contratos de los años 1976, 1978 y 1979; no hay contratos de años anteriores. (TE, 30 de noviembre de 2005, págs. 75-76).
Respecto a los funcionarios de ASSMCA, el Sr. Alberto Santana Rosa, quien para el 2000 se desempeñaba como Supervisor del Área de Relaciones Laborales y Servicios al Empleado de ASSMCA, declaró que su oficina no tramitó documentación alguna relacionada a la solicitud de retiro del Dr. Rosselló. La Certificación no se originó en su oficina, no está en el formato usual que se utiliza y contiene una equivalencia de puesto que no corresponde a su oficina. La Sra. Haddock no le informó sobre la Certificación y ese tipo de certificación no lleva la firma del Administrador. (TE, 30 de noviembre de 2005, págs. 110-118).
La Sra. Virgen Meléndez Díaz, quien se desempeñaba en la Oficina de Servicios al Empleado de ASSMCA como Coordinadora de Asuntos de Retiro, declaró que si una persona se va a jubilar y trabajó por contrato en ASSMCA, debe solicitar una hoja de servicios al área de finanzas. Las personas que trabajaron por contrato quedan fuera del Área de Recursos Humanos, por lo que no procede una certificación de la Sra. Haddock, Directora de esa área. La Certificación no se hizo en su división, ese formato no es el que ellos utilizaban. (TE, 30 de noviembre de 2005, págs. 155-160).
La Sra. Hilda O'Neill Borrero, Ayudante del Director del Área de Finanzas de ASSMCA, declaró que su oficina es la que certifica los trabajos prestados por contrato, no la Oficina de Recursos Humanos. Su oficina no preparó la Certificación y la que ellos preparan no lleva la firma del Director de Recursos Humanos, ni del Administrador. (TE, 30 de noviembre de 2005, págs. 133-139).
El Sr. Iván O'Neill León laboraba en la Unidad de Clasificación y Retribución de la Oficina de Recursos Humanos de ASSMCA. Esta Unidad es la que hace las equivalencias de los puestos. La equivalencia que aparece en la Certificación no la hizo su unidad. El puesto Asistente de Grupos de Terapia y Liderato no existe en la agencia. (TE, 30 de noviembre de 2005, págs. 144-150).
El Sr. Benjamín Pérez Martínez, quién trabajó por muchos años en la Oficina de Personal del Gobierno, OCALARH, OCAP y ORHELA, en el Área de Clasificación, testificó que para la década de los 60 no existía el puesto que se menciona en la Certificación (Exhibit 7). (TE, 1 de diciembre de 2005, págs. 77-85).
La Sra. Myrna Maldonado Negrón, quien era la Secretaria Ejecutiva de la Oficina de Recursos Humanos para el 2000 y trabajaba para la Sra. Haddock, declaró que toda la correspondencia que se recibía en esa oficina la recibía ella y la anotaba en un libro. Ella no tramitó correspondencia alguna en relación al retiro del Dr. Rosselló y nunca vio la Certificación. En su oficina no se acostumbraba hacer ese tipo de certificación, lo que se prepara es *747 una hoja de servicios con codificación. (TE, 30 de noviembre de 2005, págs. 167-176).
Declararon otros funcionarlas de ASSMCA, tales como, la Sra. María del Carmen Martínez Resto, Administradora de Documentos (TE, 30 de noviembre de 2005, págs. 80-83); la Sra. Elba González Nieves, Asistente Administrativo Confidencial (TE, 30 de noviembre de 2005, págs. 93-95); la Sra. Lydia Julia Betancourt Martínez, Secretaria del Administrador de ASSMCA (TE, 30 de noviembre de 2005, pág. 99); y la Sra. Lourdes Milagros Morales Cales (TE, 30 de noviembre de 2005, págs. 178-180). Todas ellas hicieron búsqueda de documentos relacionados a la Certificación y no encontraron documento alguno, ni siquiera la Certificación.
Todos estos testimonios confirman que la Certificación se preparó sin que existiera en los récords del Departamento de Salud, ni de ASSMCA prueba alguna de que el Dr. Rosselló hubiera prestado los servicios que aparecen en la misma y sin que existiera el puesto que allí se indica. Estos testigos son los funcionarios y empleados públicos que custodian los documentos y preparan la información necesaria para hacer las certificaciones como la Certificación y a ninguno de ellos se le pidió que interviniera en el caso.
Además, testificaron el Sr. Juan Flores González, Secretario de Hacienda (TE, 1 de diciembre de 2005, pág. 94), y la Sra. Hedga García Cruz de la Oficina de Conservación y Disposición de Documentos del Departamento de Hacienda (TE, 30 de noviembre de 2005, págs. 181-183), quienes certificaron que no surge documento alguno de que al Dr. Rosselló se le haya pagado por servicio alguno durante los años 1962, 1963 y 1964.
Finalmente declaró el Sr. Alexis Morales Fresse, de la Oficina de Recursos Humanos del Recinto de Ciencias Médicas de la Universidad de Puerto Rico, quien realizó una búsqueda de los contratos de servicios del Recinto, los cuales datan desde que existía la Escuela de Medicina Tropical y no encontró contratos del Dr. Rosselló para los años 1962, 1963 y 1964. El contrato más remoto que encontró fue de julio de 1966.
En resumen, con la prueba desfilada en el juicio se cubrieron todas las posibilidades de dónde pudo surgir la información contenida en la Certificación y se probó que tal información no existía, era falsa. Además, la prueba demostró claramente que el Dr. Acevedo tramitó personalmente con la Sra. Haddock la Certificación, sin que ésta se canalizara por los trámites correspondientes para estos documentos y sin que apareciera en los archivos de la agencia expediente alguno sobre el asunto, ni siquiera copia de la propia Certificación. De esta conducta, surge sin lugar a dudas, que el apelante expidió la Certificación conociendo que la información allí incluida no existía, era falsa.
Por último, el Art. 3.2 (c) de la Ley de Etica tipifica como delito que un funcionario o empleado público utilice los deberes o facultades de su cargo para obtener directa o indirectamente para cualquier persona, negocio o entidad ventajas, beneficios o privilegios que no estén permitidos por Ley. El apelante alega que no se probó mas allá de duda razonable que él conocía que el Dr. Rosselló no tenía derecho a la pensión que solicitó al Sistema de Retiro y la Certificación le iba a completar a éste determinado número de años. No tiene razón.
En este caso se probó que el Dr. Acevedo utilizó la facultad que le confería su cargo como Administrador de ASSMCA para preparar la Certificación y así el Dr. Rosselló obtuviera el beneficio de una pensión mayor que a la que tenía derecho de no haber obtenido la Certificación. A estos fines, la Leda. Marisol Marchand Castro, quien fue Administradora de la Administración de los Sistemas de Retiro del Gobierno de Puerto Rico, declaró que al dejar sin efecto la Certificación, los años de servicio del Dr. Rosselló eran 29.25 y no 30, por lo que se le redujo la pensión. (TE, 1 de diciembre de 2005, págs. 55-75). Por lo tanto, luego de una evaluación minuciosa de la prueba presentada en el juicio, concluimos que el apelante cometió este delito.
*748 Es doctrina reiterada que la apreciación y adjudicación de la prueba testifical corresponde, en primera instancia, al foro sentenciador y los tribunales apelativos intervendremos con ella sólo cuando se demuestre que instancia incurrió en error manifiesto, pasión, prejuicio o parcialidad. Pueblo v. Roldan López, 158 D.P.R. 54, 61 (2002). Esto responde a que el juzgador de los hechos está en mejor posición para aquilatar la prueba presentada porque ha tenido el beneficio de ver directamente la manera que los testigos se expresaron y comportaron en la silla testifical. Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598-599 (1995). Consecuentemente, las determinaciones que hace el juzgador de los hechos en instancia no deben ser descartadas arbitrariamente ni tampoco sustituirse por el criterio del foro apelativo, salvo que de la prueba surja que el foro sentenciador no contó con base suficiente que establezca la culpabilidad del acusado más allá de duda razonable. Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 63 (1991).
En este caso, el Ministerio Público probó la culpabilidad del apelante más allá de duda razonable por los delitos de certificaciones falsas expedidas por funcionarios públicos y el delito tipificado en el Artículo 3.2 (c) de la Ley de Ética, mediante prueba suficiente y admisible en derecho. Así lo entendió el Jurado y por ello lo condenó en estos cargos. Además, el análisis objetivo de la prueba testifical y documental que evaluó el juzgador de los hechos no demuestra que éste actuó motivado por pasión, prejuicio, parcialidad o cometiera error manifiesto en la apreciación de la prueba que tuvo ante su consideración. Por lo tanto, no podemos intervenir con esta determinación. El tercer error señalado por el apelante no fue cometido en cuanto a los delitos de infracción a los Artículos 207 del Código Penal y 3.2 (c) de la Ley de Ética.
Y
En su último señalamiento, el apelante alega que las sentencias impuestas por las infracciones a los Arts. 271 y 207 del Código Penal y el Art. 3.2 (c) de la Ley de Ética violan la norma de concurso de delito establecida en el Art. 63 del Código Penal (Art. 63 del Código Penal), 33 L.P.R.A. see. 3321. Expresa que las tres acusaciones se refieren al mismo evento y si sólo revocamos la convicción por la infracción al Art. 271 del Código Penal, se le estaría castigando dos veces por el mismo acto. No tiene razón.
El TPI sentenció al apelante a un (1) año de reclusión por la infracción al Art. 3.2 (c) de la Ley de Ética y dispuso que esta pena se cumpliría en forma consecutiva con la pena de seis (6) meses impuesta en el caso por infracción al Art. 207 del Código Penal y concurrente con la pena de seis (6) años impuesta por la infracción al Art. 271 del Código Penal.
El Art. 63 del Código Penal regula la figura del concurso de delitos y dispone, en su parte pertinente, que “un acto u omisión penable de distintos modos por diferentes disposiciones penales, podrá castigarse con arreglo a cualquiera de dichas disposiciones, pero en ningún caso bajo más de una. La absolución o convicción y sentencia bajo alguna de ellas impedirá todo procedimiento judicial por el mismo acto u omisión, bajo cualquiera de las demás. ”
Surge de este artículo que cuando un acto ilegal infringe varias disposiciones penales, su autor sólo puede ser castigado por una. Sobre el particular, nuestro más alto foro ha dispuesto que el concurso de delitos no prohíbe la acusación y condena en un mismo juicio por varios delitos que surjan del mismo acto u omisión. Pueblo v. Santiago, 160 D.P.R. 618, 630 (2003); Pueblo v. Millán Meléndez, 110 D.P.R. 171, 177 (1980). Por tanto, el Art. 63 del Código Penal se circunscribe a proscribir la imposición de penas múltiples por un mismo acto u omisión. Pueblo v. Meléndez Cartagena, 106 D.P.R. 338, 342 (1977).
Por otro lado, para determinar si un acto ilícito es único para efecto de la protección del Art. 63 del Código Penal es necesario evaluar la prueba sobre las conductas efectuadas, así como la intención del autor de las mismas. Si en efecto las actuaciones del acusado constituyen una unicidad de acto, su curso de conducta sólo puede ser penado por una disposición legal. Si, por el contrario, la prueba presentada demuestra que el actor interesaba alcanzar distintos propósitos, la protección del concurso es inaplicable, por lo que el mismo será *749 castigado por tantos delitos como lesiones infligidas. Véase, Pueblo v. Meléndez Cartagena, 106 D.P.R., a la pág. 347.
El concurso de delitos “no es de aplicación cuando el acusado persigue varios objetivos criminales independientes entre sí y no meramente incidentales, pudiendo ser castigado por los delitos independientes cometidos en la persecución de cada.objetivo, aunque los delitos dependan de actos comunes o sean parte del curso de conducta de otra forma indivisible. ” Pueblo v. Echevarría Rodríguez I, 128 D.P.R. a la pág. 370.
Para poder determinar si existe o no concurso de delitos, debemos analizar los elementos de cada uno de los delitos imputados, y aplicarlos a los hechos particulares del presente caso.
Como mencionáramos anteriormente, el Alt. 207 del Código Penal prohíbe expedir una certificación falsa en la cual se certifiquen declaraciones que le constan ser falsas al funcionario o empleado público. Este delito es general y se castiga meramente la conducta de expedir una certificación falsa, sin que se tenga que probar un propósito o intención de crear un derecho o defraudar a alguien. Por su parte, el Art. 3.2 (c) de la Ley de Ética prohíbe que un funcionario o empleado público utilice los deberes y facultades de su cargo para gestionarse para sí o para un tercero, ventajas, beneficios y privilegios.
Como podemos observar, estas dos disposiciones legales regulan conductas diferentes y tienen diferentes propósitos.
En el caso que nos ocupa, surge de la prueba presentada que el apelante le remitió primero la certificación de los años alegadamente trabajados por el Dr. Rosselló a la Leda. Ivette Molina Rivera, quien para diciembre de 2000 se desempeñaba como Directora Ejecutiva del Hospital de Psiquiatría, con el propósito de que ésta firmara, sin tener evidencia para sustentarlas. (TE, 1 de diciembre de 2005, págs. 9-12). Esta testigo devolvió el documento sin firmal', por no tener la evidencia de lo que en él se certificaba. Posteriormente, el apelante remitió a la Sra. Haddock, Directora de Recursos Humanos de ASSMCA, quien era su subalterna, la Certificación para que ésta la firmara. (TE, 8 de diciembre de 2005, págs. 32 y ss.).
Ciertamente, la prueba demostró que el apelante utilizó su autoridad como Administrador de AMSSCA para proveerle al Dr. Rosselló un tiempo de servicio público que éste necesitaba para recibir una mayor pensión de retiro, conducta que va mucho más allá de la requerida en el Alt. 207 del Código Penal.
El apelante cometió dos conductas delictivas independientes que requerían distinta intención: la primera fue el acto de certificar falsamente que el Dr. Rosselló laboró unos períodos de tiempo en una agencia gubernamental (Art. 207 del Código Penal), y la segunda, utilizar su autoridad para lograr que se beneficiara al Dr. Rosselló con una pensión que no le correspondía (Art. 3.2 (c) de la Ley de Ética). Como indicamos, el Art. 63 del Código Penal requiere que exista un sólo acto u omisión penable de distintos modos. Por tal razón, resolvemos que no existe concurso de delitos respecto a los dos delitos imputados. Las sentencias emitidas por el TPI fueron conforme a derecho y dentro de la sana discreción judicial. El señalamiento de error número cuatro no se cometió.
VI
Por los fundamentos expresados, se confirman las sentencias dictadas por violaciones a los Artículos 207 del Código Penal y 3.2 (c) de la Ley de Ética y se revoca la sentencia por violación al Artículo 271 del Código Penal.
Notifíquese inmediatamente.
*750 Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIO 2008 DTA 17
1. En el escrito de apelación, el apelante planteó nueve (9) errores y en su alegato hizo ocho (8) señalamientos de errores que no coinciden con los del escrito de apelación. Debido a que en su alegato el apelante se limitó a argumentar cuatro errores, en el ejercicio de nuestra discreción no discutiremos sus otros planteamientos. Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 165 (1996); J. R. T. v. Hato Rey Psychiatric Hosp., 119 D.P.R. 62, 67 (1987); Pueblo v. Corales Irizarry, 107 D.P.R. 481, 494 (1978).